**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID MARQUART,** | : | **No. 1:23cv1095** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **AMAZON.COM SERVICES, LLC,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**MEMORANDUM**

David Marquart claims that his former employer Defendant Amazon.com

Services LLC ("Amazon") violated the Americans with Disabilities Act, as

amended, 42 U.S.C. §§ 12101, *et seq.* ("ADA") and the Pennsylvania Human

Relations Act, 43 PA. STAT. §§ 951, *et seq.* ("PHRA") by failing to accommodate

his disabilities.  Per plaintiff, he requested a 30-minute adjustment to his shifts so

he could continue to commute with a co-worker.  Before the court is a motion for

summary judgment filed by Amazon. (Doc. 44).  For the reasons set forth below,

the motion will be denied.

**Background**

Doctors diagnosed Plaintiff David Marquart with Asperger's Syndrome

when he was approximately five years old. [1] (Doc. 45-3, Pl. Dep., 71:9-13.).

_____

[1] Unless noted otherwise, the court cites to the defendants' statement of material facts
("SOF"), (Doc. 45), for facts which the plaintiff admitted in his response to the SOF, (see Doc.
51, "RSOF").  All facts from the record are construed in a light most favorable to plaintiff as the

According to plaintiff, his condition affects his ability to focus on multiple things at once. (Pl. Dep. at 73:11-74:7; 78:15-19).  Plaintiff testified that he focuses so hard on one task that he loses track of everything else. (Id. at 73:12-23, 78:15-19).

Marquart does not drive. (Pl. Dep. at 73:16-18, 74:2-7; SOF ¶¶ 26, 61).  He testified that he struggles with being aware of his surroundings while in control of a vehicle. Id.  During his employment with Amazon, plaintiff relied on a co-worker, Lloyd Myers, to commute to and from work. (Pl. Dep. at 41:24-42:13, 99:23-11:10; SOF ¶ 26).

According to Marquart's testimony, he also struggles with social cues and interacting with people. (Pl. Dep. at 75:4-7).  Plaintiff's condition affects his ability to learn new information, such as remembering names or dates. (Id. at 83:10-84:7).  Plaintiff's condition, however, does not impact his ability to follow instructions. (Id. at 84:14-16).  For example, plaintiff could work without a supervisor if he knows "what task to do and what the task entails[.]" (Id. at 84:14-25).  Plaintiff testified that he did not have any other physical or mental disabilities when he worked for Amazon. (Id. at 71:1-4).

---

nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015) (citation omitted).

Marquart began working for Amazon in November 2019 as an associate at its PHL4 fulfillment center. (Doc. 45-5, Def Ex. E, Offer Letter, ECF p. 2).  As explained by Amazon's witnesses, PHL4 is a facility in their network that completes customer orders. (Doc. 45-1, N. Martin Dep., 11:16-25). [2]  Fulfillment associates at PHL4 are divided into inbound and outbound departments. (Id. at 37:7-25).  The inbound department works with incoming freight and is responsible for handling packages between their arrival at PHL4 until their placement in storage. (Id.)  By contrast, the outbound department handles outgoing freight.  That department's responsibilities consist of retrieving packages from storage and loading them onto a truck. (Id.)

The PHL4 facility also employs associates in other support roles, such as in inventory control and quality assurance ("ICQA"). (Id. at 37:21-25, 46:17-25, 48:8-20).  The ICQA department at PHL4 is separate from the inbound and outbound departments and is supervised by a separate manager. (Doc. 45-10, M. Rhodes Dep., 28:13-29:10). [3]   In that department, fulfillment associates

---

[2] Portions of the background section refer to the testimony or declarations of Amazon employees.  For brevity, the court will cite to the names and titles of those employees in the footnotes.

Background facts about the processes and departments of PHL4 are derived, in part, from the testimony of Nathan Martin.  Nathan Martin served as a human resources ("HR") manager at Amazon at the time relevant to this action. (Doc. 45-1, N. Martin Dep., 9:5-22).

[3] At all relevant times to this action, Rhodes was employed by Amazon as an HR business partner. (Doc. 45-10, M. Rhodes Dep., 18:18-19).

ensure that "inventory is both where it is supposed to be and [in] the quantity it's supposed to be, and in the condition that [Amazon] expect[s] it to be in." (Doc. 45-1, N. Martin Dep., 46:20-25, 48:2-7).

Marquart began working at PHL4 in the inbound department on the night shift. (Doc. 45-3, Pl. Dep., 38:8-15).  His shift was 6:30 p.m. to 5:00 a.m. from Sunday through Wednesday with Thursday as an overtime day. (Id.)  On an as-needed basis, plaintiff worked in PHL4's outbound department. (Id. at 22:21-23:11, 24:4-25:5).  For example, he worked in the outbound department during the winters of 2019 and 2020. (Id. at 24:4-10).  While assigned to the outbound department, plaintiff's tasks involved, among other things, loading trucks at the outbound dock. (Id. at 23:8-11).

In 2020, due the COVID-19 pandemic, Amazon implemented staggered shift times for the inbound department. (Doc. 45-4, C. Bonner Dep., 73:21-74:16).[4]  Specifically, Amazon implemented shift separations in 15-minute increments to promote social distancing and ensure that employees coming into work were not coming in at the same time. (Id. at 74:6-11; Doc. 45-10, M. Rhodes Dep., 65:10-18).

---

[4] Christopher Bonner was a senior HR assistant at Amazon during the period relevant to this action. (Doc. 45-4, C. Bonner Dep., 11:1-6).

Marquart testified that Amazon first attempted to change his start time when it implemented the pandemic-related shift staggering. (Doc. 45-3, Pl. Dep., 40:10-43:3). At that time, plaintiff disclosed his disabilities to Amazon's human resources ("HR") department. (Id.) He requested a change back to his original schedule so he could continue carpooling with his co-worker. (Id.) Amazon granted plaintiff's request and kept his shift time the same. (Id.)

In early 2021, Amazon eliminated the Sunday to Wednesday shift in the inbound department for business reasons. (Doc. 45-10, M. Rhodes Dep., 76:18-78:14). Managers asked fulfillment associates in that department to "voluntarily" change shifts as part of efforts to standardize "the shift patterns and the start times[.]" (Id. at 78:1-6). Accordingly, Amazon moved inbound department fulfillment associates to a Monday through Thursday night shift. (Id. at 71:12-72:3; Doc. 45-8, Ex. 2 to Barnett's Declaration).[5] For Marquart, this meant that his start time would be moved up 30 minutes, from 6:30 p.m. to 6:00 p.m. (Doc. 45-8, Ex. 2 to Barnett's Declaration). On February 15, 2021, plaintiff signed a document accepting his shift change. (Id.) However, plaintiff testified that he spoke with HR on his first workday after the shift change and requested that his start time be changed back to 6:30 p.m. (Doc. 43-5, Pl. Dep., 47:14-50:10). HR

---

[5] James Barnett was a senior accommodation consultant at Amazon's Disability and Leave Services during the period relevant to this action. (Doc. 45-7, J. Barnett Dep., 15:9-17:5).

granted plaintiff's request. (Id.)  Marquart was thus able to maintain his shift, from 6:30 p.m. to 5:00 a.m.

Marquart's last shift at PHL4 occurred in May 2021. (Pl. Dep. at 66:13-16). In May 2021, Amazon informed its fulfillment associates that it would be eliminating staggered shifts. (Doc. 45-3, Pl. Dep., 50:15-51:12; see also Doc. 45-12, Email from C. Bonner, ECF pp. 4-5).  With this change, all associates on plaintiff's shift were now scheduled to work from 6:00 p.m. to 4:30 a.m. (Pl. Dep. at 127:13-17; see also Doc. 45-8, Ex. 2 to Barnett's Declaration).  Therefore, Marquart's Monday-to-Thursday shift was adjusted to begin and end 30 minutes earlier. (Pl. Dep. at 127:13-17).  Amazon did not permit associates in the inbound department to work beyond the scheduled 4:30 a.m. end time. (Pl. Dep. at 94:24-96:15; Doc. 45-13, Job Accommodation Report).  Per Amazon, this rule was due to a lack of supervisory support coverage for the department after 4:30 a.m. (Doc. 45-13, Dep. Ex. 8., Job Accommodation Report).

Marquart expressed concern to an Amazon HR staff member that the change in his schedule would interfere with his ability to carpool with his co-worker, Myers, who was an ICQA department associate. [6] (Doc. 45-4, Bonner

---

[6] Specifically, Amazon's senior HR assistant Christopher Bonner testified that he discussed accommodation options with Marquart in May 2021. (Doc. 45-4, C. Bonner Dep., 108:15-17). Plaintiff testified that he does not remember whether this specific conversation took place with Bonner. (Doc. 45-3, Pl. Dep., 57:18-21; 138:16-23).

Dep., 101:17-102:1, 103:16-104:15; Doc. 45-3, Pl. Dep., 56:14-59:6).  At that time, Myers's shift began at 6:30 p.m. and ended at 5:00 a.m. (Pl. Dep., 101:4-11).  Plaintiff shared with the HR staff member that he did not drive because of his Asperger's and requested that his schedule coincide with that of Myers. (Id. at 57:2-59-3).  According to plaintiff's testimony, apart from ensuring that he could arrive to work on time, there was no reason he could not work the amended shift.  (Id. at 42:6-13).  Plaintiff testified that the conversation with the HR staff member ended with that person "saying that he would let [plaintiff] know if the request would go through." (Id. at 58-21-24).

On May 20, 2021, with the help of his mother, Marquart sent an email to the HR team at PHL4 formally requesting that he keep his assigned shift time of 6:30 p.m. to 5:00 a.m. in his position in the inbound department. [7] (Id. at 59:12-61:9, 85:23-86:5).  According to plaintiff's testimony, his requests to keep the same shift time were the only accommodations he sought during his employment with Amazon. (Id. at 59:12-61:9, 85:23-86:5).

Marquart testified that once Amazon de-staggered the shifts for the inbound associates, he stopped going to work. (Id. at 63-9-64:21). Plaintiff's last

---

[7] Marquart testified that he relied on his mother throughout his life to help him navigate daily matters. (Doc. 45-3, Pl. Dep., 60:21-61-3).  Therefore, he turned to her for assistance in making this request for accomodation. (Id.) Marquart further testified that due to his disability, he was unable to effectively communicate his request for an accommodation verbally to HR. (Id. at 51:20- 59:6, 62:11-63:4).

7

shift at PHL4 was on May 26-27, 2021. (Id. at 66:13-16). He never returned to work after that date. (Id. at 66:4-16).

Before proceeding further, it is appropriate to outline the options that Amazon offered to Marquart during the interactive process. Those options were extended either before or after plaintiff's final shift. In response to plaintiff's concerns, Amazon offered to transfer him to the outbound and ICQA departments to accommodate his claimed disability. (Pl. Dep. at 107:8-14; Doc. 51, RSOF ¶ 66). Additionally, at some point, Amazon also offered to transfer plaintiff to another Amazon site, PHL5, which was ostensibly closer to his house. (Pl. Dep. at 138:24-139:9). Amazon also offered to let plaintiff work a modified 9.5-hour shift, which would have started at 6:30 p.m. so that he could commute to work with his co-worker. (Pl. Dep. at 94:16-95:14; Doc. 45, SOF ¶ 70). Nevertheless, as discussed later, plaintiff either rejected Amazon's offers or requested further clarification after which he encountered a lack of communication from Amazon.

Returning to the timeline, Marquart testified that he was put on an approved leave by Amazon after May 27, 2021. (Pl. Dep. at 64:25-65:7). Plaintiff also testified that he could not remember the date when his leave would end. (Id. at 67:1-10). According to the plaintiff, his leave was cut short, but he does not

remember the exact date due to the confusion caused by communicating with multiple Amazon departments. (Id. at 68:4-69:4).

After Marquart's last day, he continued to engage in communication with Amazon about his requested accommodation. (Id. at 64:14-65:16).[8]  On May 28, 2021, plaintiff faxed documents to Amazon. (Pl. Dep., 173:4-15; Doc. 47-3, Dep. Ex. 7; Doc. 47-5).  In those documents, Marquart's healthcare provider identified plaintiff's "ability to arrive at work at the requested hour due to dependence on rides from [his] coworker" as the sole limitation that was interfering with his job performance. (Doc. 47-4, ECF p. 3).  Plaintiff's healthcare provider recommended the following accommodations: "change work starting time to 30 minutes later than it is currently" and "change work ending time to 30 minutes later than it is currently." (Id. at ECF p. 2).  When asked whether plaintiff could safely continue working in his current position while Amazon evaluated accommodation options, plaintiff's healthcare provider indicated "No," and added that "a leave of absence will be initiated on [the plaintiff's] behalf." (Doc. 47-3, ECF p. 5).

---

[8] On May 27, 2021, a member of Amazon's Disability and Leave Services ("DLS") team emailed Marquart requesting that he complete an "attached packet" to help Amazon "better understand [his] needs and how to best support [his] restrictions." (Doc. 45-8, Ex. 4 to Barnett's Declaration).

On June 17, 2021, after email and telephone communications between Marquart and Amazon, Amazon issued plaintiff a return-to-work notice effective June 21, 2021 and requested that he provide a medical release from his doctor. (Doc. 45, SOF ¶ 105; Doc. 45-22, Return to Work Notice, ECF p. 2). Marquart's doctor sent Amazon the return-to-work notice indicating that plaintiff could return to work as of June 24, 2021, so long as he could get a ride to and from work. (Doc. 45-3; Pl. Dep., 69:11-18; Doc. 45-8, Ex. 7 to Barnett's Declaration). Marquart's doctor further noted that plaintiff could perform his job fully and was fit to return with no restrictions so long as he had reliable transportation. (Doc. 45-8, Ex. 7 to Barnett's Declaration).

As of June 28, 2021, Marquart had not reported to the PHL4 location. (Doc. 45-3, Pl. Dep., 69:11-22). Amazon informed plaintiff that any absences after June 23, 2021 were not covered by leave and were subject to Amazon's attendance rules and policy. (See Doc. 45-23, Failure to Return to Work Notice, ECF p. 2). On July 4, 2021, Amazon's HR department sent plaintiff an email notifying him that he was "flagged" for job abandonment because he had missed two or more scheduled shifts. (Doc. 45-24, Job Abandonment Notice; DeVito Dep., 68:17-69:14). Thereafter, on August 3, 2021, Amazon sent plaintiff a letter stating that Amazon was unable to accommodate his request to extend his shift by 30 minutes. (Doc. 45-25, Letter from M. Rhodes, ECF p. 2). Eventually,

10

Amazon terminated Marquart as of September 13, 2021. (Doc. 45-26, Amazon Termination Letter; Doc. 45-3, Pl. Dep.,144:23-145:17).

Based on the above events, Marquart's complaint asserts that Amazon violated the ADA and the PHRA by failing to reasonably accommodate his disability. (Doc. 1, ¶¶ 39–52). Following the close of discovery, Amazon filed a motion for summary judgment on Marquart's ADA and PHRA claims, which is fully briefed by the parties. After review of the record, the motion will be denied.

**Jurisdiction**

Because Marquart asserts an ADA claim, the court has jurisdiction pursuant to 28 U.S.C. § 1331. The court has supplemental jurisdiction over the plaintiff's PHRA claim pursuant to 28 U.S.C. § 1367(a).

**Legal Standard**

Granting summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir.1997) (quoting FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

11

fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248.  A fact is material when it might affect the outcome of the suit under the governing law. Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

"In employment discrimination cases, the summary judgment standard 'is applied with added rigor' because 'intent and credibility are crucial issues.'" Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004)

(quoting Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir. 1997)).

Moreover:

> Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this is clearly a factual question, summary judgment is in fact rarely appropriate in this type of case.

Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497, 509–10 (3d Cir. 1996)

(internal quotation marks, citation, and explanatory parentheticals omitted).

## Analysis

According to Marquart, Amazon's conduct violated the ADA and PHRA when it failed to reasonably accommodate him.[9] Specifically, Marquart claims that Amazon failed to help him identify an effective accommodation so he could continue working there. [10] (Doc. 50, Br. in Opp. at 1). According to the plaintiff,

---

[9] The court will address plaintiff's ADA and PHRA claims collectively. See Colwell v. Rite Aid Corp., 602 F.3d 495, 500, n. 2 (3d Cir. 2010) ("[T]he same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA.").

[10] Amazon seeks summary judgment on disparate treatment and failure-to-accommodate theories of liability. (Doc. 44-1, Br. in Supp. at 9, 15). Disparate treatment claims are governed by the three-part burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000). The McDonnell Douglas framework does not apply to failure-to accommodate claims. See Sharbaugh v. W. Haven Manor, LP, No. CV 14-1723, 2016 WL 6834613, at *7 (W.D. Pa. Nov. 21, 2016); Reyer v. Saint Francis Country House, 243 F. Supp. 3d 573, 595 (E.D. Pa. 2017); Allen v. Verizon Pennsylvania, Inc., 418 F. Supp. 2d 617, 622 (M.D. Pa. 2005) (collecting cases).

Marquart's brief in opposition confirms that he is only pursuing failure-to-accommodate claims in this case. (Doc. 50, Br. in Opp. at 21-22). The McDonnell Douglas analysis is thus inapplicable here. In ruling upon Amazon's motion for summary judgment, however, the court will consider all arguments to the extent that they are relevant to the ADA/PHRA failure-to-

Amazon failed to communicate with him regarding the precise limitations imposed by his disability and, as a result, failed to identify potential reasonable accommodations that would have enabled him to overcome those limitations. (Id. at 14).

Under the ADA, "no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). As defined by law, the term "discriminate against a qualified individual with a disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. 12112(b)(5)(A).

Under the law, a plaintiff bringing a failure-to-accommodate claim must establish that: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith

---

accommodate claims. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (indicating that the third prong of a prima facie ADA discrimination case encompasses "failing to make reasonable accommodations for a plaintiff's disabilities.").

effort to assist; and (4) he could have been reasonably accommodated." Capps v. Mondelez Glob., LLC, 847 F.3d 144, 157 (3d Cir. 2017) (quoting Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246 (3d Cir. 2006) (footnote and additional citations omitted)); see also Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 320 (3d Cir. 1999).

The parties dispute the facts surrounding the final two elements of the above test, that is, whether Amazon made a good faith effort to accommodate Marquart's disability and whether the plaintiff could have been reasonably accommodated.[11] As discussed below, those disputes reflect genuine issues of material fact, which precludes summary judgment in favor of Amazon.

### 1.    Amazon's Good Faith Efforts to Accommodate Marquart

Amazon contends that it made sufficient good-faith efforts to comply with the ADA. (Doc. 44-1, Br. in Supp. at 10).    Pursuant to the ADA, "[t]he term 'reasonable accommodation' may include . . . job restructuring, part-time *or modified work schedules,* [and] reassignment to a vacant position[.]" 42 U.S.C. § 12111(9)(B) (emphasis added); see also Colwell v. Rite Aid Corp., 602 F.3d 495, 505 (3d Cir. 2010)

---

[11] For summary judgment purposes, Amazon does not dispute that Marquart has a disability within the meaning of the ADA which prevented him from driving. (Doc. 44-1, Br. in Supp. at 5, n. 2). Amazon also does not dispute that it had notice of the plaintiff's disability. Furthermore, it is undisputed that the plaintiff requested an accommodation related to his known disability. (Id. at 10; Doc. 45, SOF ¶¶ 60-61, 63, 77).

15

As the Third Circuit has indicated, "the accommodations listed in Section

12111(9)(B) are not exclusive and specifically contemplate workplace

accessibility." Colwell, 602 F.3d at 505.  Moreover, "there is nothing inherently

unreasonable . . . in requiring an employer to furnish an otherwise qualified

disabled employee with assistance related to [his] ability to get to work." Id.

(quoting Lyons v. Legal Aid Society, 68 F.3d 1512, 1517 (2d Cir. 1995)).  Federal

anti-discrimination law thus recognizes that reasonable shift modifications may

be necessary to accommodate an employee's disability-related difficulties in

getting to work.

With the motion for summary judgment, Amazon contends that it did not

violate the law because it offered plaintiff the following reasonable

accommodations: 1) transfer to the outbound department; 2) transfer to the ICQA

department; 3) transfer to another site closer to Marquart's home; 4) a modified

9.5-hour shift from 6:30 p.m. to 4:30 a.m.; and 5) a lengthy leave of absence to

allow him time to consider his options. (Doc. 44-1, Br. in Supp. at 6, 14).  The

court will address each of Amazon's arguments in turn.

*Transfer to the outbound department* – Amazon avers that it offered to

move Marquart to the outbound department at PHL4, which would have allowed

him to keep his work schedule as is. (Doc. 45, SOF ¶¶ 66-67).  Defendant

asserts that the plaintiff was well-qualified to work in that department because he

16

had prior experience working there. (Id. ¶¶ 13, 28-30; Doc. 44-1, Br. in Supp. at 10). According to Amazon, the plaintiff rejected the proposed accommodation because it was not to his liking, he thought the work was too "labor intensive," and he did "not like the people at the ship dock." (SOF ¶¶ 71-75; Id. at 10; Doc. 45-4, C. Bonner Dep., 106:22-107:2). Per Amazon, these reasons are unrelated to the plaintiff's disability. (Id. at 10).

On the other hand, Marquart contends that there is no evidence that Amazon had an open fulfillment associate position in the outbound department at the time he sought an accommodation. (Doc. 51, RSOF ¶ 75 (i)). Plaintiff testified that an Amazon senior accommodation consultant, Liz Cioffi, informed him in an email that site leadership would be able to transfer him to the outbound department. (Doc. 45-3, Pl. Dep., 107:8-24). Plaintiff admitted that he rejected the offer to work in the outbound department. (Id. 108:17-19). However, contrary to Amazon's assertions, plaintiff testified that he did so because he thought he was unable to complete all the required tasks needed for the job. (Id. at 108:21-3). Per plaintiff, he did not believe he was adequately trained to work in the outbound department full-time. (Id. at 88:8-93:6). He asserts that he requested training to perform outbound job duties on multiple occasions, but Amazon never responded to his requests. (Id.) Notably, Marquart testified that he was not able to bring any of his concerns to Amazon. (Id. at 110:16-111:14). According to the

plaintiff, Amazon frequently failed to respond to his concerns and that it seemed like there were only one-way communications. (Id.)

Based on the above review of the record, there are genuine issues of material fact as to whether Marquart was qualified to work in the outbound department. See Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence[.]") (citation omitted). A reasonable jury could conclude that, although plaintiff was offered the option to transfer to the outbound department, he was unable to address his concerns about that transfer due to the unresponsiveness of Amazon. (See Pl. Dep. at 110:12-25).

*Transfer to the ICQA department* – Amazon also asserts that it offered to move Marquart to the ICQA department at PHL4. (Doc. 45, SOF ¶¶ 66-67). Although plaintiff did not have any prior work experience there, Amazon contends he could perform the duties of an ICQA associate. (See Doc. 44-1, Br. in Supp. at 10). As with the proposed transfer to the outbound department, Amazon argues that plaintiff rejected this accommodation because it was not to his liking. (Id. at 11).

In opposition, Marquart testified that Amazon never officially offered him the option to transfer to the ICQA department. (Pl. Dep. at 122:5-25). Instead,

according to the plaintiff, an individual at Amazon only mentioned it as a possibility. (Id.) [12]  Plaintiff also asserts that he did not believe a transfer to that department was a viable option as he understood that the night shift there was being phased out in mid-2021. (Id. at 100:15-24).  Moreover, plaintiff denied that he declined to transfer to the ICQA department because it was not to his liking. (Id. at 123:21-24).  Thus, whether Amazon offered Marquart the option to work in the ICQA department turns on witness credibility, rendering the issue appropriate for resolution by a jury. See Horowitz v. Fed. Kemper Life Assur. Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) ("Summary judgment is inappropriate when a case will turn on credibility determinations.") (citing Anderson, 477 U.S. at 255).

*Transfer to the PHL5 site* – In addition to offering plaintiff the opportunity to transfer to other departments, Amazon contends that it proposed to transfer Marquart to another site closer to his home, the PHL5 facility. (Doc. 44-1, Br. in Supp. at 12).  Per Amazon, this accommodation would have potentially reduced or eliminated plaintiff's reliance on his co-worker for transportation. (Id.)  In response, plaintiff admitted that Amazon offered him this option. (Doc. 45-3, Pl. Dep., 138:24-139:6).  Plaintiff, however, could not remember what his response was to such an offer. (Id. at 139:17-20).

---

[12] Based on Marquart's testimony, it appears that an ICQA manager, among others, raised the possibility of his transfer to that department. (Doc. 45-3, Pl. Dep., 119:21-121:6).

Nonetheless, plaintiff reasonably disputes that this option constituted an effective alternative to his requested accommodation. (Doc. 50, Br. in Opp. at 18). According to the plaintiff, the summary judgment record supports a finding that no other reliable transportation was available to him. (Id.) In any event, as discussed more fully below, genuine issues of material fact exist regarding Amazon's communications with the plaintiff, making the entry of summary judgment in favor of Amazon unwarranted.

*Modified 9.5-hour shift* – Amazon also asserts that it offered Marquart a modified 9.5-hour shift with a different start time (from 6:30 p.m. to 4:30 a.m., as opposed to 6:00 p.m. to 4:30 a.m.) to accommodate his disability. [13] (Doc. 44-1, Br. in Supp. at 12-13). According to defendant, this accommodation would have allowed plaintiff to start his shift 30 minutes later, end his shift at 4:30 a.m., and then wait 30 minutes to carpool with his co-worker. (Doc. 45, SOF ¶ 70). Amazon argues that plaintiff outright rejected this accommodation despite admitting in his testimony that waiting 30 minutes for a ride was possible. (Id. ¶¶ 71, 73-75, 96, 116; Doc. 44-1, Br. in Supp. at 13).

---

[13] Fulfillment associates at PHL4 generally worked ten hours a day, with a daily 30-minute unpaid break. (Doc. 45-1, N. Martin Dep., 49:18-22; Doc. 45-4, C. Bonner Dep., 49:2-8).

Upon review of Marquart's deposition, he admitted that Amazon offered him a modified 9.5-hour shift. (Doc. 45-3, Pl. Dep., 95:5-14). However, plaintiff testified that it was unclear to him when his modified shift would end due to a mistake in Amazon's job accommodation report. (Id. at 95:16-24; see Doc. 45-13, Deposition Ex. 8, Job Accommodation Report).

Specifically, Amazon's accommodation report indicates that it "[could] accommodate [plaintiff] starting 30 minutes late, but not working 30 minutes after the shift ends due to a lack of support coverage planned at that time." (Id.) Nonetheless, the same report also provides that the shift would begin "30 minutes later" and end "30 minutes later (6:30p – **5:30a)**." (Id.) (emphasis added). This language suggested to plaintiff that Amazon was offering him a longer shift than he originally worked, with an end time of 5:30 a.m. (Pl. Dep. at 95:5-96:15). Per Marquart, this inconsistency confused him. (Id. at 95:16-96:21). Plaintiff testified that he and his mother tried to get some clarification from Amazon, but Amazon never responded. (Id. at 96:2-97:1). According to plaintiff's testimony, he and his mother also asked Amazon whether "it would be okay to accept this partial accommodation without giving up on the ability to attempt to get the full accommodation down the line [.]" (Id. at 103:5-12). Still, Amazon did not respond to these inquiries according to the plaintiff's account of events. (Id.)

Consequently, a reasonable factfinder may find Marquart's testimony credible and supported by the evidence, thereby creating a genuine issue of material fact. Resolution of this factual dispute is thus more appropriately left to a jury.

*Leave of absence* – Amazon contends that it further accommodated Marquart by providing him with a lengthy leave of absence so he could consider the accommodations offered. (Doc. 44-1, Br. in Supp. at 14). Amazon argues that, during this leave, plaintiff had the opportunity to arrange alternative transportation or consult with his medical provider. (Id.) Per Amazon, plaintiff failed to do so, and defendant was under no obligation to allow him to remain on leave indefinitely. (Id.)

Contrary to Amazon's assertions, Marquart argues that the record establishes a continuous and deep misunderstanding by Amazon as to both what he was requesting and the link between the requested accommodations and his disability. (Doc. 50, Br. in Opp. at 12). Plaintiff contends that Amazon's HR department and Amazon's Disability and Leave Services ("DLS") department persisted in viewing his request as strictly related to transportation even after DLS received multiple medical documents indicating that his disability also impacted how he learns, communicates, and interacts with others. (Id.) Marquart argues that this misunderstanding was exacerbated by Amazon's lack of

22

communication. [14] (Id.)  By way of example, plaintiff's testimony describes his interaction with Amazon during the interactive process as "always one way" because, on many occasions, he would not get answers from Amazon to his questions or concerns. (Doc. 45-3, Pl. Dep., 110:12-25).  The testimony of plaintiff's mother supports these contentions. (Doc. 45-15, DeVito Dep., 75:18-76:14).  For instance, plaintiff's mother testified that communication with Amazon was "poor at best" and that "[n]avigating this process was challenging at best." (Id. at 76:10-14).

Furthermore, Marquart testified that at the time Amazon terminated him on September 13, 2021, he believed that Amazon was still in the process of working out a reasonable accommodation for him at PHL4. (Doc. 45-3, Pl. Dep.,140:24-142:9).  Consistent with that understanding, plaintiff's mother testified that her son was represented by counsel for two months during part of the interactive process. (Doc. 45-15, DeVito Dep., 75: 19-24).  Plaintiff testified that he was terminated while his counsel was actively communicating with Amazon to reach an agreement as to his requested schedule modification. (Doc. 45-3, Pl. Dep., 132:12-133:11).  Per Marquart's testimony, Amazon later notified him that he was

---

[14] In his testimony, Marquart specifically stated that he had no recollection of anyone at PHL4, including senior HR assistant Christopher Bonner, discussing with him the possibility of a transfer to the ICQA or outbound departments or moving to a site closer to his home. (Doc. 51, RSOF ¶ 65; Doc. 45-3, Pl. Dep., 58:2-59:6).

terminated "in error" and "prematurely" while its HR department was still trying to accommodate him. (Id. at 225:6-11; Doc. 50, Br. in Opp. at 24). Additionally, at least one of Amazon's HR witness's testimony is consistent with Marquart's assertions. (See Doc. 45-10, M. Rhodes Dep., 152:24-153:25). Therefore, a genuine issue of material fact exists as to whether plaintiff was able to meaningfully consider the accommodations offered by Amazon during his leave of absence given the defendant's failure to address his concerns. [15] Additionally,

---

[15] Marquart's contentions that Amazon failed to respond to his accommodation-related concerns necessitate further discussion of the interactive process. Under the law, once the employer is aware of the employee's disability and the desire for the accommodation, the employer must engage in the interactive process in good faith. Taylor, 184 F.3d at 315-16.

With respect to the interactive process, the Third Circuit has held that:

> An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer . . . [N]either party should be able to cause a breakdown in the [interactive] process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith.

Taylor, 184 F.3d at 312 (quoting Bultemeyer v. Fort Wayne Cmty. Schs., 100 F.3d 1281, 1285 (7th Cir. 1996)).

Furthermore, "a party that fails to communicate, by way of initiation or response, may also be acting in bad faith." Colwell, 602 F.3d at 507 (citations omitted).

Here, a reasonable jury could find that Amazon did not communicate effectively with plaintiff about his accommodation options. A reasonable jury could reach the conclusion that Amazon acted in bad faith by purposefully avoiding further interaction with the plaintiff that may have clarified his concerns about proposed accommodations. See Colwell, 602 F.3d at 507.

the factual issue of whether plaintiff was terminated prematurely is better suited for a jury.  Summary judgment is thus not warranted in this case.

### 2.    Whether Plaintiff Could Have Been Reasonably Accommodated

Although summary judgment will be denied based on the above analysis, the court is also persuaded that there are genuine issues of material fact as to whether Amazon could have reasonably accommodated the plaintiff, the last element of a failure-to-accommodate claim.  In demonstrating this element, an employee must make a prima facie showing that his proposed accommodation was possible.  Turner v. Hershey Chocolate U.S., 440 F.3d 604, 614 (3d Cir. 2006) (citation omitted).  If so, the burden shifts to the employer to prove as an affirmative defense that the accommodation requested was unreasonable or would cause undue hardship. Id.

*Plaintiff's initial burden* – As indicated above, Marquart bears a preliminary burden of establishing that maintaining his shift schedule of 6:30 p.m. to 5:00 a.m. was possible.   Based on the summary judgment record, plaintiff worked the same shift from 6:30 p.m. to 5:00 a.m. from 2019 to 2021 until Amazon decided to de-stagger shifts in the inbound department.  According to plaintiff's testimony, Amazon permitted ICQA associates to stay and continue working without issue after the shift officially ended at 4:30 a.m. (Doc. 45-3, Pl. Dep., 194:14–196:15). Plaintiff also testified that ICQA associates were advised to report to the

outbound managers for work issues or to the emergency medical services center in case of any injuries at the PHL4 facility. (Id.)  To further support his position, plaintiff points to the testimony of an Amazon HR witness, who stated that operations at PHL4 continued between 4:30 a.m. and 5:00 a.m., during which outbound fulfillment associates would be "packing and picking," the ICQA department and its managers would remain on duty, and the "safety department" would be staffed onsite. (Doc. 45-10, M. Rhodes Dep., 97:7-99:19).   Moreover, plaintiff testified that a fulfillment associate at PHL4 could stay, not sign out, and "continue doing a number of tasks without issue[.]" (Doc. 45-3, Pl. Dep., 126:19-127:17).  Apart from "being told to go home at this time," there was no restriction with the tasks themselves that would have prevented a fulfillment associate from working until 5:00 a.m. according to the plaintiff's testimony. (Id.)

Furthermore, Marquart's request to maintain his shift from 6:30 p.m. to 5:00 a.m. to commute to work with his co-worker is not unreasonable based on precedential case law.  The ADA may require that an employer modify the work schedule of an employee who, because of his disabilities, cannot obtain reliable transportation on the employer's preferred schedule. Colwell, 602 F.3d at 504–06.  "[A]s a matter of law," changing an employee's schedule "in order to alleviate [his] disability-related difficulties in getting to work is a type of accommodation that the ADA contemplates." Id. at 504.  The ADA "can obligate an employer to

26

accommodate an employee's disability-related difficulties in getting to work"

when "the requested accommodation is a change to a workplace condition that is

entirely within an employer's control and that would allow the employee to get to

work and perform [his] job." Id. at 505 (citing 29 C.F.R. § 1630.2(o)(1)(ii)-(iii)).

Under these circumstances, Marquart has met his prima facie burden on the

reasonableness of his accommodation.

*Amazon's subsequent burden* – Under the law, Amazon can rebut

Marquart's preliminary showing with evidence that the requested accommodation

was unreasonable or would cause an undue hardship on the employer. Turner,

440 F.3d at 614.

As defined by the ADA, "undue hardship" means "significant difficulty or

expense" for the employer when considering factors such as:

> (i) the nature and cost of the accommodation needed under this chapter;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

> (iv) the type of operation or operations of the covered
> entity, including the composition, structure, and functions
> of the workforce of such entity; the geographic
> separateness, administrative, or fiscal relationship of the
> facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10)(A)–(B).

Amazon argues that Marquart insisted that he be provided a wholly
unreasonable accommodation, namely a modified shift in his existing role within
the inbound department. (Doc. 44-1, Br. in Supp. at 2; Doc. 45-10, M. Rhodes
Dep., 127:22-128:15). According to Amazon, granting that request would have
required plaintiff to work alone and without supervision after all other employees
and managers in the inbound department had gone home. (Id.)  Amazon
contends that the inbound department at PHL4 would cease operation at 4:30
a.m. and for safety and supervisory reasons, no fulfillment associates in that
department were permitted to work past 4:30 a.m. (Id. at 5). Amazon further
contends that the law simply does not require an employer to provide such an
unsafe and unreasonable accommodation. (Id.)

Nevertheless, the summary judgment record contains contradictions.
According to Marquart's testimony, at the time he requested a reasonable
accommodation, Amazon permitted associates in the inbound department to
continue working after the shift officially ended at 4:30 a.m. (Doc. 45-3, Pl. Dep.,
193:13-194:13). Plaintiff further testified that, around that same period, Amazon

28

permitted his co-workers in the ICQA department to work "ghost shifts," i.e., in an unsupervised manner, until 5:00 a.m. (Id. at 194:14-195:16). [16]  Moreover, Marquart testified that Amazon advised the associates in the ICQA department to report to the outbound department managers for work issues or to the company EMS center in case of any injuries if they occurred after 4:30 a.m. (Id.)

As to any undue hardship defense, Amazon did not offer evidence establishing that adjustments to plaintiff's work schedule would have been costly, difficult, or disruptive to the company.  Amazon, instead, asks the court to presume that allowing plaintiff to work until 5:00 a.m. in the inbound department would have been an undue hardship.  The court, however, cannot make those assumptions at the summary judgment stage.  Based upon the record, the court can discern no cost, difficulty, or disruption caused by allowing Marquart to work until 5:00 a.m.  Thus, on this record, Amazon has failed to rebut Marquart's preliminary showing that the accommodation he requested would have caused an undue hardship.  For these additional reasons, the court will deny the motion for summary judgment.

---

[16] Specifically, Marquart testified that all associates in the ICQA department at PHL4 worked a "ghost shift" until 5:00 a.m. and did so without supervision. (Doc. 45-3, Pl. Dep., 194:14-195:19).  He further explained that ICQA associates did not have a specific supervisor assigned to their department and worked independently throughout their shifts, seeking guidance from the outbound supervisors only when necessary. (Id. at 195:7-13).

**Conclusion**

Amazon's motion for summary judgment, (Doc. 44), will be denied.  An appropriate order follows.  This matter will be scheduled for a pretrial conference by way of a separate order.

Date: 1/22/26

JUDGE JULIA K. MUNLEY
United States District Court